FILED

2015 AUG 31   PM 12: 57

CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ TM _____ DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT ESTRADA,<br><br>    Petitioner,<br><br>    vs.<br><br>MARTEL, Warden,<br><br>    Respondent. | CASE NO. 14cv1692-DMS (KSC)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

On July 17, 2014, Alberto Estrada ("Petitioner"), a state prisoner proceeding *pro se* and *in forma pauperis*, filed his Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. [Doc. 1] The petitioner raises two claims of ineffective assistance of counsel ("IAC"): claim one alleges IAC by appellate counsel, and claim two alleges IAC by trial counsel during plea negotiations. *Id.* at 28, 37.

This Report and Recommendation is submitted to United States District Judge Dana M. Sabraw pursuant to Title 28, United States Code, Section 636(b), and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California. Based on the moving and opposing papers, and for the reasons outlined below, this Court **RECOMMENDS** that the Petition be **DENIED**.

/ /

/ /

/ /

# I. PROCEDURAL HISTORY

On June 24, 2009, a complaint was filed charging Albert Estrada with multiple counts of kidnaping, robbery, burglary, carjacking, display of a firearm, and possession of a firearm by a felon. [Lodg. 1, Vol. 1, pp. 1-7] The charges arose from three discrete armed robberies that prosecutors alleged occurred in June 2009: one on the morning of June 12, 2009, and two on the morning of June 20, 2009. *See Section II, infra.* The petitioner proceeded to trial on June 28, 2011, on an amended information alleging a total of 13 criminal counts. [Lodg. 1, Vol. 1, pp. 24-25]

After six days of trial, on July 8, 2011, the jury convicted Mr. Estrada of the following crimes: counts one and two, kidnaping for robbery on or about June 20, 2009; counts three, four, and five, robbery on or about June 20, 2009; count six, burglary on or about June 20, 2009; count seven, carjacking on or about June 20, 2009; count eight, robbery on or about June 12, 2009; counts ten and eleven, child abuse on or about June 12, 2009. [Lodg. 1, pp. 132-42] As to counts one through seven, the jury found true allegations that Mr. Estrada personally used a firearm. *Id.* As to counts eight, ten, and eleven, the jury similarly found true allegations that Mr. Estrada was armed with a firearm. *Id.* The jury acquitted Mr. Estrada of count twelve, felon in possession of a firearm. *Id.* at 142. The jury could not reach a verdict on count nine, burglary on or about June 12, 2009, and that count was dismissed by the Court at sentencing. *See id.* at 20-21, 500; [Lodg. 3, Vol. 10, p. 2756].

On September 9, 2011, the trial court sentenced Mr. Estrada to an indeterminate term of life with the possibility of parole on the kidnaping counts, and a consecutive determinate prison term of 33 years four months for the remaining counts and firearms enhancements.[1] [Lodg. 1, pp. 437-49, 500-02]; [Lodg. 3, Vol. 10, pp. 2757-58]

---

[1] The California Court of Appeal characterized the petitioner's sentence as "an indeterminate prison term of 34 years to life for counts 1 and 2 and the related firearms enhancement" and "a consecutive determinate prison term of 33 years four months for the remaining counts and firearms enhancements." [Lodg. 7, p. 2]

14cv1692-DMS (KSC)

1    Through counsel, the petitioner filed an appeal on March 22, 2012. [Lodg. 4]
2    The petitioner raised six distinct arguments challenging his trial, conviction and
3    sentencing. *Id.* The state opposed each of the grounds for appeal. [Lodg. 5] In an
4    unpublished, 27-page written opinion, the California Court of Appeal agreed with the
5    petitioner that the trial court should have stayed his sentences for counts three and four,
6    and ordered the trial court to modify the abstract of judgment accordingly.[2] [Lodg. 7,
7    p. 3] The appellate court affirmed the judgment in all other respects. *Id.* The Supreme
8    Court denied the petitioner's petition for review on March 27, 2013. [Lodg. 11]

9    The petitioner filed a *pro se* petition for writ of habeas corpus before the San
10   Diego Superior Court on November 18, 2013, raising a single claim of ineffective
11   assistance of appellate counsel. [Lodg. 12] The Superior Court denied his petition in
12   a 9-page written opinion dated January 13, 2014. [Lodg. 13] The petitioner filed a
13   petition for writ of habeas corpus in the California Court of Appeal on February 4,
14   2014, again raising the single claim of ineffective assistance of appellate counsel.
15   [Lodg. 14] The California Court of Appeal denied the petition in a two-page written
16   order two weeks later. [Lodg. 15] On April 4, 2014, the petitioner filed a petition for
17   writ of habeas corpus before the California Supreme Court. [Lodg. 16] There, for the
18   first time, the petitioner argued ineffective assistance of trial counsel during plea
19   negotiations in addition to ineffective assistance of appellate counsel. *Id.* The
20   California Supreme Court denied his petition without comment on June 25, 2014.
21   [Lodg. 17]

22   The instant federal petition for writ of habeas corpus was timely filed in this
23   Court on July 17, 2014. [Doc. 1] The petitioner raises the same two claims that he
24   presented to the California Supreme Court: ineffective assistance of appellate counsel,
25   and ineffective assistance of trial counsel. *Id.* The respondent filed a response on
26   October 16, 2014, opposing the petition in its entirety. [Doc. 12] After careful review

27
28

---

[2] This modification did not alter the length of petitioner's sentence.

1   of the complete trial and appellate records and the moving and opposing papers, this

2   Court recommends that the District Court DENY the petition.

3                        **II. STATEMENT OF TRIAL FACTS**

4          The Court of Appeal's unpublished opinion sets forth a comprehensive factual

5   background summarizing the testimony of the state's witnesses at trial. [Lodg. 7, pp.

6   3-10] Title 28 U.S.C. §2254(e)(1) creates a statutory presumption that the state court's

7   findings of facts were correct, and the petitioner bears the burden of disproving these

8   facts by clear and convincing evidence. *Tilcock v. Budge*, 538 F.3d 1138, 1141 (9th Cir.

9   2008).   This Court has conducted an independent review of the trial record and

10  confirmed that the Court of Appeal's factual findings comport with the record.   The

11  Court of Appeal found:

12          *Crimes against Jose Villanueva and Carlos Espinoza (Counts 1–4)*

13
                At around 9:00 a.m. on June 20, 2009, Carlos Espinoza went to his
14      friend Jose Villanueva's apartment. The two men were standing outside
        talking in the alley behind the apartment building when a Hispanic man
15      approached them and pointed a black revolver at Villanueva's head. The
        man was approximately 5 feet 2 inches tall and weighed approximately 120
16      to 125 pounds. He was between 25 to 30 years old and had a bit of facial
        hair. He also had a tattoo on his neck. He wore blue jeans, a gray hooded
17      sweatshirt and dark sunglasses. He had a black, knit beanie in his back
18      pocket.
                The man took their cell phones and told them to turn around. He
19      threatened to shoot them if they turned back around or looked at him. He
20      then directed them to move approximately 85 feet to the recessed entryway
        of an apartment building across the alley. The area where he moved them
21      was more secluded than the area where they had first been standing. He told
        them to open the building's entry gate quickly or he was going to "f—k"
22      them. Villanueva turned back to look at the man and the man threatened to
23      "shoot his head off." Villanueva tried to open the gate, but it was locked. At
        that point, Espinoza and Villanueva felt trapped because the man stood
24      behind them with a gun, there was a locked gate in front of them, a fence to
25      the left of them, and the window and door of an apartment to the right of
26      them.
                When Villanueva could not open the gate, the man started to hit the
27      window of the apartment. A young man peeked out of the window. The
28

young man then whistled and his neighbors started coming out from their apartments.  At that point, the man with the gun ran away.

*Crimes Against Nava, Zavala & Cuevas (Counts 5–7)*

The same morning, Jose Zavala went to pick up his cousin from his aunt Maria Nava's house, which was approximately seven miles or a 10-minute drive from the Villanueva's apartment building. His cousin, his cousin's wife, and his cousin's young son lived with Nava. Nava's brother, Valentin Cuevas, was also visiting Nava that morning. While Zavala waited on the couch with Cuevas for his cousin to get ready, some church members stopped by for five to eight minutes and left.

Almost immediately afterwards, someone knocked on the door. Thinking the church members had returned, Nava opened the door. A 25- to 35-year-old Hispanic man stood at the door. He wore a gray hooded sweatshirt, blue jeans and white shoes. She asked him what he needed, but he did not answer. Instead, he took a revolver out of his pants, put it to her abdomen, and told her to go back into the house. The man backed her into a corner in the dining room. Thinking the gun was a toy, Nava grabbed it. She discovered it was cold and heavy and determined it was real. She and the man struggled over the gun. She released it as he pushed her hard into a wall. He then demanded money and she told him she did not have any because she had paid the rent.

Zavala did not have a good view of the area where Nava and the man were, but he heard the ruckus. When he got up to see what was wrong, the man swung around and pointed the gun, a black steel .38–caliber revolver, at him and Cuevas.

The man told Zavala to sit back down, which he did, and told Nava to come out of the dining room and sit next to Zavala and Cuevas, which she did. The man then demanded money. Nava went to the backyard where her daughter-in-law was, got $20 dollars from her and gave it to the man. Meanwhile, Zavala and Cuevas dug in their pockets. Cuevas also gave the man $20.  To get the man out of the house, Zavala took his keys out of his pocket, placed them on the coffee table, falsely stated his wallet was between the seats of his vehicle and told the man he could go get it. The man took the keys, left the house, got into Zavala's vehicle and drove away.

Zavala called 911. He told a 911 operator a very thin Hispanic man in his early twenties walked into the house with what appeared to be a black .39 revolver and demanded money. The man wore a gray sweater, gray pants, dark sunglasses, and a sports team ball cap.

Nava similarly told a 911 operator the man was a short, skinny, dark-complected Hispanic in his early to late 20's.  He wore a dark gray, hooded shirt and gray denim pants.  She told a police officer the robber was a

Hispanic male, in his middle to late 20's, with brown eyes and dark skin. He was about 5 feet 6 inches tall, about 160 pounds, and wore a gray hooded zipper jacket and baggy blue jeans.

San Diego Police Officers Daniel Stanley and Adam Shrom (*sic*) were patrolling the area and responded to the call from a few blocks away. They heard a dispatch stating the suspect took a vehicle and they spotted it approaching them. When the suspect saw them, he pulled over, got out of the vehicle, and walked into a parking lot. He was wearing blue jeans, white tennis shoes, and a gray hooded sweatshirt. He had on a blue baseball cap underneath the sweatshirt.

Officers Stanley and Shrom stopped and got out of their patrol car. Shrom ordered the suspect to stop, but the suspect immediately ran through the parking lot and jumped some fences. As he ran, he removed his clothing. Shrom went into a nearby alley to try to intercept him. Stanley got back into the patrol car, drove around the block, and started coordinating with other officers to set up a perimeter to contain the suspect.

Stanley noticed Estrada sitting on a front porch wearing nothing but a pair of jeans. He stopped his patrol car. He asked Estrada where the suspect went. Estrada pointed west and said the suspect had jumped a fence. As Stanley continued his investigation, a police dispatcher provided an updated description of the suspect, which matched Estrada. Stanley looked for Estrada. He found him across the street on another porch pretending to be asleep and took him into custody.

Estrada had a puncture wound on his left hand and his jeans were torn, both consistent with him having jumped a chain-linked fence. In addition there was a trail of clothing leading from the area where the suspect abandoned the stolen vehicle to the location where Stanley first encountered Estrada, including a black glove, a black-and-orange glove, a blue bandana, a black bandana, a blue long-sleeve T-shirt, a gray hooded sweatshirt, black sunglasses, a blue ball cap, and a black ski mask. There were two $20 bills in the pocket of the sweatshirt and a loaded .38 caliber revolver in the stolen vehicle.

DNA testing showed Estrada was the predominate contributor to the DNA mixture on the sweatshirt, T-shirt, blue bandana, and black glove and a possible major contributor to the DNA mixture found on the ski mask, black bandana, and black-and-orange glove. He was a possible minor contributor to the DNA mixture found on the ball cap. There was insufficient DNA found on the gun and the sunglasses to reach any conclusions.

Nava identified Estrada as the robber at a curbside lineup and at the preliminary hearing. She also identified the gray sweatshirt officers found as the gray jacket the robber was wearing. Cuevas also identified Estrada at a curbside lineup.

A church member was leaving a home when she saw a man run from an alley and jump a wire fence. The man fell down, got back up, removed his gray sweatshirt, and continued running. The church member next saw the man sitting on the front porch of the house next door to the one she had been visiting. He did not have a shirt on. She continued walking. When she later turned around, she saw he had on a white tank top and was talking to a police officer. The man then walked across the street.

At a subsequent curbside lineup, the church member identified the man as Estrada. She did not attempt to identify Estrada at trial, indicating she did not think she would recognize him because it had been a long time and she had never seen the man before or after the incident. Her minor nephew, who had been visiting homes with her, also identified the man as Estrada at the curbside lineup, but did not attempt to identify the man at trial for the same reasons as his aunt.

### Crimes Against the L. Family[3] (Counts 8, 9, 10, & 11)

Mr. L. is self-employed as a tow truck driver and mechanic. His home address, home phone number, and cell phone number appear on the side of his tow truck. On June 12, 2009, he received a cell phone call from a restricted number. The female caller requested towing assistance for her car, which she said was parked in front of a department store at a shopping center. Mr. L. went to the shopping center, which was a 15-minute drive from his house. He left his wife and two young foster daughters at home. When he arrived at the shopping center, he searched for the woman for approximately 10 minutes, but did not find her.

After Mr. L left his home, a tall Hispanic man approximately 28 years old knocked on the door of the home and asked for a business card. When Mrs. L. opened the door to give him a card, he pushed his way into the home. He pointed a black gun at her chest and told her he would not kill her if she sat down. She sat down and grabbed one of her foster daughters. The other daughter was in an upstairs bathroom.

At that point, another young Hispanic man came into the house. He was short, between 4 feet 9 inches and 5 feet 2 inches tall, and wore a mask covering his entire face except his eyes. He asked if anyone else was in the house. To protect her other foster daughter, Mrs. L. lied and told him no one else was there. However, around that time, her other foster daughter came downstairs and ran to her.

---

[3] The L.s are long-time foster parents. We have omitted their identifying information to protect the identity of their foster children, two of whom were victims in this case.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

As the taller man stood about four feet from her pointing a gun at her and her foster daughters, the masked man searched the house. He demanded "the black box," which Mrs. L. assumed meant he wanted a safe. She told him that she only had a file cabinet, not a black box. He searched her room and took her jewelry box. He started aggressively demanding money, so she gave him $900 she kept in the filing cabinet. One of her foster daughters also offered to give him a gold necklace her biological mother had given her on her birthday. He then went upstairs into her son's room and took her son's jewelry as well as handcuffs, a flashlight, and a camera her son used for his security job. When the masked man came downstairs with her son's belongings, he demanded Mrs. L's car keys. However, the taller man with the gun vetoed the idea of taking a car because doing so would make them easier to follow and catch. The two men then left. They told her not to call the police or they would kill her.

Mrs. L. called her husband and told him what happened. He realized the call for service was made to lure him out of the house. He rushed home and found her and their foster children frightened and crying. He immediately called 911. His wife had been afraid to call because of the robbers' threat to kill her. During the call, he handed the phone to his wife. She told the 911 operator both men were dressed entirely in black. One of the men was tall, in his late 20's, with a medium build. He wore sunglasses and carried a small, black gun. The other one was short, thin and wore a mask over his face.

Vanessa Gonzalez testified Estrada came to her home early in the morning on June 12 and asked her for a ride to a house. She took him there. He went inside and returned with a cell phone. At his behest, she told the person on the other end of the call that her car had broken down and she needed a tow. After that, she returned the cell phone to Estrada and went home. She saw Estrada again the next day at a friend's house. He had a folded wad of money with him. He threw a $20 bill at her and told her to buy herself something. Sometime before the crimes at the L.s' home, she saw Estrada with a revolver.

The subscriber of the cell phone used to contact Mr. L. was Miriam Macareno. Macareno gave the cell phone to her cousin, Youset Patino, who was Estrada's girlfriend. According to Patino's preliminary hearing testimony, which was read to the jury because she was unavailable to testify at trial, Estrada came to her house one morning and borrowed the cell phone. He took the phone to a car with a female occupant. He returned the phone to Patino about 10 minutes later. Estrada left about five minutes after that. The driving time from Patino's home to the L.s' home was approximately five minutes.

### III. AEDPA'S STANDARD OF REVIEW

Federal habeas corpus relief is available only to those who are in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a "highly deferential standard" for evaluating state-court rulings on federal habeas review, and "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citations omitted). "By its terms § 2254(d) bars relitigation of any claim adjudicated on the merits in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Under AEDPA, a federal habeas petition shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim: 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)-(2).

A state court's decision may be found to be "contrary to" clearly established Supreme Court precedent if: 1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or 2) if the state court confronts a set of facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision may be found to be "an unreasonable application" of clearly established federal law if that state court correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case. *Id.* at 407-08. Relief under the "unreasonable application" clause of § 2254(d)(1) is only available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question." *White v. Woodall*, __ U.S. __, 134 S. Ct. 1697, 1706-07 (2014) (citation omitted).

### III.  PETITIONER'S CLAIMS ARE EXHAUSTED

As an initial matter, this Court must determine whether the petitioner's constitutional claims have been exhausted in the state court.  The exhaustion of available state judicial remedies is a prerequisite to obtaining federal habeas corpus relief.  28 U.S.C. § 2254(b).  "Mixed petitions" containing both exhausted and unexhausted claims must be dismissed, leaving the petitioner with the choice of returning to state court to exhaust his claims or amending or resubmitting the habeas petition to present only exhausted claims to the district court.  *Rose v. Lundy*, 455 U.S. 509, 510 (1982).  If any of the petitioner's claims are not exhausted, this Court must consider whether state remedies remain available such that the prisoner would benefit from the opportunity to fully exhaust his claims in state court.  *See Johnson v. Zenon*, 88 F.3d 828, 831 (9th Cir. 1996).

"A petitioner has satisfied the exhaustion requirement if: (1) he has 'fairly presented' his federal claim to the highest state court with jurisdiction to consider it... or (2) he demonstrates that no state remedy remains available." *Johnson*, 88 F.3d at 829 (citations omitted).  A claim can be exhausted even if it is presented only to the California Supreme Court, bypassing the lower state courts, if it is addressed on the merits by the state supreme court. *Wilson v. Knowles*, 638 F.3d 1213, 1214 n.1 (9th Cir. 2011); *Greene v. Lambert*, 288 F.3d 1081, 1086 (9th Cir. 2002) ("exhaustion does not require repeated assertions if a federal claim is actually considered at least once on the merits by the highest state court").

Courts may presume that an unexplained denial of an original habeas proceeding by the California Supreme Court is an adjudication on the merits of the claim contained therein and is entitled to deference under AEDPA unless "there is reason to think some other explanation for the state court's decision is likely." *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011).[4]  When a state court reaches a decision on the merits but

---

[4] The Ninth Circuit summarized the facts of *Harrington* as follows: "[A] state habeas petitioner had raised an IAC claim before the California Supreme Court.  The

1   provides no reasoning to support its conclusion, "although we independently review

2   the record, we still defer to the state court's ultimate decision." *Pirtle v. Morgan*, 313

3   F.3d 1160, 1167 (9th Cir. 2002).

4        Here, the petitioner first presented his claim of ineffective assistance of trial

5   counsel to the California Supreme Court, bypassing the lower courts.  Though the

6   California Supreme Court denied the petitioner's habeas petition in a one-line summary

7   decision, nothing in the record rebuts the presumption that this denial was made on the

8   merits of all the claims contained therein.  The petitioner's state court petition appears

9   to have been timely filed and procedurally proper.  Accordingly, this Court finds that

10  the petitioner has fully exhausted both of his constitutional claims and deference to the

11  state court's decision under ADEPA is appropriate.  Where, as here, a state court denies

12  a claim on its merits but provides no reasoning to support its conclusion, "we

13  independently review the record, [but] we still defer to the state court's ultimate

14  decision." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

15                    ## IV. THE *STRICKLAND* STANDARD

16       The petitioner has raised two claims of ineffective assistance of counsel ("IAC").

17  The standard of review for a claim of IAC is well established under *Strickland v.*

18  *Washington*, 466 U.S. 668 (1984), and "[s]urmounting *Strickland's* high bar is never

19  an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  To prevail, a defendant

20  must show two things: first, that counsel's performance was so deficient as to fall short

21  of the guarantee of "counsel" under the Sixth Amendment; and second, that counsel's

22  errors were so prejudicial as to deprive the defendant of a fair trial. *Strickland*, 446

23  U.S. at 687.  The *Strickland* standard is "highly deferential" to counsel; the Supreme

24  Court recognized that "[i]t is all too tempting for a defendant to second-guess counsel's

25  assistance after conviction or adverse sentence." *Id.* at 689.  The Court further held

26  _____

27  court denied the claim in a one-sentence summary order. The U.S. Supreme Court held
    that this was an adjudication on the merits, notwithstanding the lack of explanation."
28  *James v. Ryan*, 733 F.3d 911, 914 (9th Cir. 2013).

that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

The standard of review for a claim of ineffective assistance raised in a federal habeas petition is even more deferential. Here, the petitioner's claim has already been evaluated and rejected once by the state court. This Court, therefore, is not called upon to determine anew whether trial counsel was ineffective. Rather, the only question before this Court is whether the state court's denial of the petitioner's claim was "unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). A state court's decision is reasonable as long as "fairminded jurists could disagree" on the correctness of the decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

As the Supreme Court explained in *Harrington*, a federal court's review of a state court's denial of an ineffective assistance claim receives double deference: "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105, *citing Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

## V. PETITIONER HAS NOT SHOWN IAC ON APPEAL

### A. Legal Standard

All of the issues raised in the petitioner's first claim relate to ineffective assistance of appellate counsel in state court proceedings. "The due process clause of the fourteenth amendment guarantees a criminal defendant the right to th effective assistance of counsel on his first appeal as of right." *Miller v. Keeney*, 882 F.2d 1428, 1431 (9th Cir. 1989) (citations omitted). The *Strickland* standards apply to claims of ineffective assistance of appellate counsel. *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010) (citations omitted). In the appellate context, to succeed on a claim of

IAC, the petitioner must show a) that counsel was ineffective, meaning that counsel acted unreasonably in failing to discover and brief a merit-worthy issue; and b) prejudice, meaning a reasonable probability that but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

When, as here, appellate counsel raises certain issues on appeal and not others, the Court must evaluate the reasonableness of counsel's conduct by looking to the merits of the omitted claims. *Moormann*, 628 F.3d at 1107. "[A]ppellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal." *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001). If appellate counsel decides to omit only those claims that have no likelihood of success, he is not ineffective. *See Pollard v. White*, 119 F.3d 1430, 1435 (9th Cir. 1997) ("A hallmark of effective appellate counsel is the ability to weed out claims that have no likelihood of success, instead of throwing in a kitchen sink full of arguments with the hope that some argument will persuade the court.") (citation omitted).

Furthermore, the performance component need not be addressed first. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. Accordingly, for those claims in which petitioner cannot demonstrate prejudice, this Court need not even evaluate appellate counsel's effectiveness in failing to raise the issue.

The petitioner contends that five distinct issues should have been raised by his counsel on appeal. This Court will address each of these sub-claims in turn.

//

//

//

//

**B.  Admission of Pre-Trial Testimony of Youset Patino**

  ***1.  Factual Background***

Youset Patino, the petitioner's ex-girlfriend, testified as a witness for the prosecution at the petitioner's preliminary hearing on October 20, 2014. [Lodg. 2, pp. 47-54] She testified that on a morning in June of 2009, the petitioner borrowed her cell phone and took it to a car where another female was seated. *Id.* at 50-51.  He returned the cell phone to her approximately 10 minutes later. *Id.* at 51.  Detective Estrella testified at the preliminary hearing that a cell phone was used to call Mr. Lozado to request vehicle towing services on the morning of the robbery.  She testified that the call in question was placed from Ms. Patino's cell phone. *Id.* at 74-75.

Prior to the trial, Ms. Patino moved to Mexico.  Detective Takeda testified during an evidentiary hearing on motions *in limine* that he spoke with Ms. Patino by telephone on March 10, 2011. [Lodg. 3, Vol. 3, p. 648] He learned that she was in Mexico, but that she was cooperative and willing to return to the United States to testify. *Id.*  After preparing paperwork for Ms. Patino's return to the United States, Detective Takeda called her on May 9, 2011, but was unable to reach her. *Id.* at 649. Detective Takeda spoke to Ms. Patino's family two or three times, but was unsuccessful in locating Ms. Patino. *Id.*  On cross-examination, Detective Takeda admitted that he had not personally gone to Mexico to find Ms. Patino because his office would not authorize the travel for safety reasons. *Id.* at 658.  He further testified that even if he had served her with a subpoena to testify, that subpoena would not be legally enforceable in Mexico. *Id.* at 653.

Before trial, the D.A. moved to introduce Ms. Patino's testimony from the preliminary hearing on the grounds that she was an unavailable witness.  Over defense counsel's objections, the trial judge made a factual finding of due diligence and ruled that the testimony would be admitted. [Lodg. 3, Vol. 3, p. 661] Ms. Patino's preliminary hearing testimony was read to the jury at trial. [Lodg. 3, Vol. 5, p. 1350]

Today, the petitioner argues that appellate counsel's failure to raise the issue on direct appeal constitutes IAC because the trial court's ruling violated his Sixth Amendment rights of confrontation. [Doc. 1, pp. 29-30] For the following reasons, this Court recommends that the claim of appellate IAC be denied.

**2. *Discussion***

The Sixth Amendment guarantees a criminal defendant the right to confront and cross-examine the witnesses against him. The Sixth Amendment permits, however, introduction of a witness's prior sworn testimony when that witness is a) unavailable to testify, and b) the defendant has had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). This rule is codified in the California Evidence Code § 1291(a)(2).

Mindful of the "doubly deferential" standard of review of IAC claims under AEDPA, this Court finds that the California Supreme Court did not act unreasonably when it denied the petitioner's appellate IAC claim. The petitioner has not demonstrated a reasonable probability that this argument would have succeeded on direct appeal, as the facts demonstrate that Ms. Patino was unavailable and that the petitioner had a sufficient opportunity to cross-examine her at the preliminary hearing.

*A. Ms. Patino Was Unavailable*

A witness who is not present at trial is only "unavailable" in the constitutional sense if the prosecution has made a "good faith effort" to secure his or her presence at trial. *Barber v. Page*, 390 U.S. 719, 724-25 (1968). This rule is codified in California Evidence Code § 240(a)(5). "The lengths to which the prosecution must go to produce a witness is a question of reasonableness." *People v. Herrera*, 232 P.3d 710, 716 (Cal. 2010) (quoting *Ohio v. Roberts*, 448 U.S. 56, 74 (1980)).

In this case, the prosecution met its burden of showing reasonable diligence in its attempts to secure Ms. Patino's presence at trial. The prosecution had attempted to contact her multiple times at her last known address in Mexico. They had asked her family members for more information about her current whereabouts. Even if the

1   D.A.'s investigator had gone into Mexico, he testified that he had no legal authority to

2   compel her attendance at trial.  The California Supreme Court has held that similar

3   unsuccessful efforts to secure a witness's appearance satisfy the constitutional "good

4   faith" and "due diligence" requirements, such that the witness's prior testimony may

5   be introduced at a criminal trial.  *See Herrera*, 232 P.3d at 721-22.

6              *B.   The Petitioner Had the Opportunity for Prior Cross-Examination*

7         "Generally speaking, the Confrontation Clause guarantees an *opportunity* for

8   effective cross-examination, not cross-examination that is effective in whatever way,

9   and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15,

10  20 (1985) (emphasis in original).  The California Supreme Court has explained, "it is

11  the opportunity and motive to cross-examine that matters, not the actual cross-

12  examination," *People v. Smith*, 68 P.3d 302, 323 (Cal. 2003), and "the admission of

13  preliminary hearing testimony under Evidence Code section 1291 does not offend the

14  confrontation clause of the federal Constitution simply because the defendant did not

15  conduct a particular form of cross-examination that in hindsight might have been more

16  effective." *People v. Samayoa*, 938 P.2d 2, 40 (Cal. 1997).

17        After reviewing the preliminary hearing transcript, this Court agrees with the

18  trial court that the petitioner had the full and fair opportunity to cross-examine Ms.

19  Patino.  His counsel asked Ms. Patino multiple questions about her relationship with

20  the petitioner. [Lodg. 2, p. 53] He questioned Ms. Patino about the name that she

21  provided to the police when they first interviewed her.  *Id.* at 54.  He questioned her

22  about the cell phone she turned over the police.  *Id.*  This line of questioning probed

23  possible witness bias, honesty, and potential criminal exposure.  Though with hindsight

24  the petitioner may now wish that his counsel questioned Ms. Patino differently, this

25  Court not called upon to second-guess counsel's assistance after the fact.  Rather, this

26  Court is bound by *Strickland*'s highly-deferential standard: "a court must indulge in a

27  strong presumption that counsel's conduct falls within the wide range of reasonable

28  professional assistance; that is, the defendant must overcome the presumption that,

1    under the circumstances, the challenged action might be considered sound trial
2    strategy." *See Strickland*, 466 U.S. at 689 (citation omitted).

3    **C. Severance of Charges**

4    Prior to trial, the petitioner through counsel moved *in limine* to sever counts
5    arising from the three separate robbery incidents under California Penal Code § 954.
6    [Lodg. 1, Vol. 1, pp. 117-20] The trial court denied the motion, finding that the all
7    counts stemmed from the same class of offenses, that there was cross-admissibility of
8    the evidence, and that the petitioner had not shown prejudice from joining the counts
9    at trial. [Lodg. 3, Vol. 3, p. 645] The petitioner alleges that his appellate counsel was
10   ineffective for failing to raise this argument on direct appeal. [Doc. 1, pp. 30-33]

11   California Penal Code § 954 permits the joinder of two or more different
12   offenses that are connected in their commission or of the same class of crimes.
13   "[B]ecause consolidation or joinder of charged offenses ordinarily promotes efficiency,
14   that is the course of action preferred by the law." *Alcala v. Sup. Ct.*, 185 P.3d 708, 720
15   (Cal. 2008). A trial court's denial of a motion for severance of charged offenses is only
16   reversed upon appeal if "the trial court's ruling falls outside the bounds of reason." *Id.*
17   (citations omitted). Additionally, "[t]he state's interest in joinder gives the court
18   broader discretion in ruling on a motion for severance than it has in ruling on
19   admissibility of evidence." *Id.*

20   Here, the trial court's ruling was not outside the bounds of reason. The charged
21   offenses fell within the same class of assaultive offenses (kidnaping, robbery). The
22   crimes also shared common elements of substantial importance, including the use of
23   a firearm and black ski mask. Furthermore, even if the trial court erred in denying the
24   motion to sever, the petitioner cannot show that his conviction would have been
25   reversed on appeal. It is an established principle of California law that even though
26   two cases are erroneously consolidated for trial, the court will not reverse the judgment
27   on appeal unless there is such a miscarriage of justice as would violate constitutional
28   provisions. *People v. Renier*, 306 P.2d 917, 920 (Cal. 1957). A careful examination

1   of the trial record in this case convinces this Court that the evidence against the
2   petitioner on charges arising from each of the three incidents was so overwhelming that
3   the consolidation of charges for trial could not have resulted in substantial prejudice
4   to him. *See id.*

5        "If it is easier to dispose of an ineffectiveness claim on the ground of lack of
6   sufficient prejudice, which we expect will often be so, that course should be followed."
7   *Strickland*, 466 U.S. at 697. Because the petitioner cannot show a probability of
8   success of this issue on appeal, this Court finds that the California Supreme Court's
9   decision was reasonable.

10  **D. Motion to Dismiss the Information For IAC at Preliminary Hearing**

11       Before trial, the petitioner moved under California Penal Code § 995 to dismiss
12  the information (or, in the alternative, for a new preliminary hearing) based on
13  counsel's ineffectiveness at the preliminary hearing. [Lodg. 1, Vol. 1, pp. 51-70] The
14  trial court denied the motion, finding that the petitioner had not shown IAC or
15  prejudice. [Lodg. 3, Vol. 3, p. 638] Today, the petitioner argues that appellate counsel's
16  failure to raise the denial of the § 995 motion on direct appeal constitutes IAC.
17  However, for reasons explained below, the petitioner cannot show a reasonable
18  probability of success on direct appeal, and thus cannot show that the California
19  Supreme Court's decision was unreasonable.

20       A criminal defendant is entitled to effective assistance of counsel and other
21  "substantial rights" at his or her preliminary hearing. *Harris v. Sup. Ct.*, 225 Cal. App.
22  4th 1129, 1144 (Cal. Ct. App. 2014). When a defendant is denied a substantial right at
23  the preliminary hearing, the ensuring commitment is illegal, entitling the defendant to
24  dismissal of the information on a timely motion. *People v. Pompa-Ortiz*, 612 P.2d 941,
25  943 (Cal. 1980). Accordingly, "[s]etting aside the information is the required remedy
26  when the defendant is denied the assistance of counsel [] at the preliminary hearing."
27  *Harris*, 225 Cal. App. 4th at 1145.

28

On direct appeal of a trial court's denial of a motion to dismiss under § 995, the standard of review is abuse of discretion. *Miller v. Sup. Ct.*, 101 Cal. App. 4th 728, 740 (Cal. Ct. App. 2002). The appellate court "must draw every legitimate inference in favor of the magistrate's ruling and cannot substitute our judgment on the credibility of witnesses or the weight of the evidence." *Id.* (citations omitted). "A reviewing court cannot disturb an exercise of discretion unless it is arbitrary, capricious, or patently absurd." *Id.* (citations omitted).

If the standard of review for IAC claims under AEDPA is "doubly deferential," *see Harrington*, 562 U.S. at 105, then the standard of review for this particular claim is quadruply so. This Court must apply AEDPA deference to an IAC claim within an IAC claim, where the Court of Appeal would have reviewed the trial court's decision for abuse of discretion. "Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), and here, where four layers of deference work in tandem, the bar is set higher than ever.

The petitioner fails to establish IAC or prejudice under the *Strickland* standard. This Court has previously discussed the performance of counsel with respect to the preliminary examination of Ms. Youset Patino. *Section V.B, supra.* After reviewing the preliminary hearing transcript in its entirety, this Court finds that counsel's representation fell within the "wide range of reasonable professional assistance." 466 U.S. at 689. During the preliminary hearing, counsel cross-examined 8 of the state's 10 witnesses. Counsel focused his cross examination on several key points, including witnesses' observations and the problems of identification. [Lodg. 2, *passim*] He elicited the favorable fact that a child present during the purported home invasion robbery on June 20, 2009, did not even notice that a robbery was taking place. *Id.* at 28-29. Counsel impeached several of the witnesses' perception of the events by challenging the lighting conditions, the witnesses' vantage point, and their feelings of fear or nervousness. *Id.* at 10, 15, 27, 35, 46, 53. Furthermore, the petitioner has not shown prejudice because the petitioner has not shown that but for the errors of counsel,

1   the outcome of the preliminary hearing would have been different.  To the contrary, as
2   noted above, this Court finds that the evidence adduced at the preliminary hearing
3   overwhelmingly supported the trial court's finding that there was probable cause to
4   hold the defendant to answer for the alleged charges.  *See* CAL. PENAL CODE § 872.

5        This Court has reviewed the transcripts of the petitioner's *Marsden* hearings[5]
6   and is aware of the petitioner's concerns regarding his representation by Mr. Herrera.
7   The Court sympathizes with the petitioner and understands his frustrations at some of
8   the allegations of Mr. Herrera's conduct.  However, this Court's review of the instant
9   petition is limited by the highly deferential standards of AEDPA and clearly established
10  federal law.  Under those standards, the petitioner has failed to demonstrate that he is
11  entitled to federal habeas relief.

12  **E. Failure to Federalize**

13       The petitioner argues that his appellate counsel was ineffective for failing to
14  "federalize" two claims in his direct appeal by citing to "a federal constitutional
15  deprivation." [Doc. 1, pp. 34-35] It appears that the petitioner is arguing that his
16  appellate counsel should have rendered specific assistance with drafting or framing
17  claims of constitutional violations for his state or federal habeas corpus petitions.

18       As properly noted by the California Superior Court in its denial of the
19  petitioner's habeas petition, however, a criminal defendant has no constitutional right
20  to counsel in habeas corpus proceedings, and consequently, no right to effective
21  assistance of counsel.  [Lodg. 13, p. 8]; *Miranda v. Castro*, 292 F.3d 1063, 1068 (9th
22  Cir. 2002); *Miller v. Keeney*, 882 F.2d 1428, 1431-32 (9th Cir. 1989) ("[The] right to
23  effective assistance of appellate counsel is derived entirely from the... right to appellate
24  counsel, and the former cannot exist where the latter is absent.").

25

26

---

27       [5] Under California law, a "*Marsden* hearing" is a hearing in which a defendant
28  requests appointment of new counsel, often for reasons of alleged ineffective
    assistance. *See People v. Marsden*, 465 P.2d 44 (Cal. 1970); *Schell v. Witek*, 218 F.3d
    1017, 1021 (9th Cir. 2000).

1   Because the petitioner had no right to effective assistance of counsel in drafting
2   claims for his habeas corpus petitions, appellate counsel was not ineffective for failing
3   to do so.  This claim should be denied.

4   **F. Cumulative Error**

5   The petitioner argues that the sum of the above errors violated his rights to
6   counsel and due process. [Doc. 1, p. 36] Federal courts have recognized that the
7   combined efforts of discrete trial errors can sometimes warrant federal habeas relief,
8   even when none of them individually does.  *Parle v. Runnels*, 505 F.3d 922, 927 (9th
9   Cir. 2007) (citing *Chambers v. Mississippi*, 401 U.S. 284 (1973)); *Alcala v. Woodford*,
10  334 F.3d 862, 882-83 (9th Cir. 2003).   However, a cumulative prejudice claim
11  necessarily presupposes that the Court will find that substantial error occurred in
12  connection with at least two subclaims. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir.
13  2011) ("Because we conclude that no error of constitutional magnitude occurred, no
14  cumulative prejudice is possible.") (citation omitted).  If the District Court adopts the
15  recommendations herein to reject the petitioner's claim of appellate IAC in its entirety,
16  "there is no single constitutional error in this case, [so that] there is nothing to
17  accumulate to a level of constitutional violation." *Mancuso v. Olivarez*, 292 F.3d 939,
18  957 (9th Cir. 2002).  This claim should be denied.

19  **G. Conclusion**

20  Cognizant of the extremely deferential standard of AEDPA on IAC claims, this
21  Court finds that the petitioner has not demonstrated that the California Supreme
22  Court's denial of his claims was unreasonable.  Accordingly, this Court recommends
23  that the petitioner's appellate IAC claim be DENIED in its entirety.

24  **VI.  PETITIONER HAS NOT SHOWN IAC OF TRIAL COUNSEL**

25  **A. Ineffective Assistance of Counsel During Plea Negotiations**

26  The petitioner argues that he was deprived of the ineffective assistance of
27  counsel during plea negotiations. [Doc. 1, pp. 37-51] Specifically, he argues that he

28

1   suffered from a "conflict of interest"[6] with "multiple public defenders" that interfered
2   with his ability to make informed decisions about the prosecutor's 19-year and 15-year
3   plea deal offers. *Id.* at 37.  The petitioner asserts that his counsel failed to build a
4   meaningful relationship of trust and failed to communicate information about the
5   petitioner's case during the course of plea negotiations. *Id.* The petitioner asserts that
6   but for counsel's inadequacies, it is "likely" that he would have accepted the 19-year
7   plea deal. *Id.*

8   **A. Background**

9   By way of background, the petitioner was represented by multiple attorneys from
10   at least two public offices throughout his case.  He raised three unsuccessful *Marsden*
11   motions.  The petitioner's first appointed attorney stepped down from the case on an
12   unknown date when he was reassigned to juvenile hall. [Doc. 1, Ex. A, pp. 65-66] His
13   second, Arturo Herrera (who represented the petitioner at the preliminary hearing on
14   October 27, 2009), was terminated from the deputy public defender's office on an
15   unknown date. *Id.* at 65.  A third attorney, also from the deputy public defender's
16   office, assumed representation on December 23, 2009. *Id.* at 63.

17   On January 12, 2010, the petitioner raised his first *Marsden* motion against his
18   third counsel of record from the deputy public defender's office. [Doc. 1, Ex. A, pp. 60-
19   69] The Court noted that the D.A. had made the petitioner a guilty plea offer of 19
20   years that day. *Id.* at 63.  The petitioner requested new counsel because his attorney
21   was not "cooperating" with him by getting him an offer for less time or "programs."[7]
22   *Id.* at 62.  Counsel explained that he had advised the petitioner that this was not the
23   type of case on which the D.A.'s office would offer straight probation or a suspended

24   _____

25   [6] "A conflict of interest exists when the attorney owes duties to someone whose
26   interests in the proceeding are adverse to those of his or her client." *People v.*
      *Mroczko*, 627 P.2d 835 (1983).  What the petitioner alleges is a conflict of opinion
27   between himself and his lawyer, not a formal "conflict of interest."

28   [7] This Court construes the petitioner's use of the term "programs" to mean non-
      custodial alternative sentences, such as drug and alcohol or mental health programs.

1   sentence.  *Id.* at 65.  He further conveyed to the court that he had informed the

2   petitioner of the D.A.'s 19-year plea offer, the strengths and weaknesses of the

3   petitioner's case, and the potential life sentencing exposure on the charges.  *Id.* at 64-

4   65.  The court denied the *Marsden* motion, finding that the petitioner had failed to

5   demonstrate a conflict of interest.  *Id.* at 66.

6          In approximately September of 2010, the petitioner's case was re-assigned to the

7   alternate public defender's office for unknown reasons.  *See* [Doc. 1, Ex. B, p. 76].  On

8   March 2, 2011, the petitioner raised his second *Marsden* motion.  *Id.* at 70-84.  He was

9   represented by a very seasoned supervisor from the alternate public defender's office.

10  *Id.* at 79.  The petitioner complained that counsel had not filed various motions and law

11  suits that he had requested, and that he did not trust the advice of his attorney, who was

12  recommending that he take a deal.  *Id.* at 72-76.  Counsel explained that from the

13  beginning, the petitioner had said he wanted to settle his case.  *Id.* at 76.  Accordingly,

14  counsel focused his efforts on negotiating a deal, because "any offer is off the table"

15  if he filed motions.  *Id.* at 78-79.  Counsel informed the court that he had been able to

16  negotiate for a more favorable guilty plea offer of 15 years and 8 months, which he

17  conveyed to and discussed with the petitioner.  *Id.* at 79.  The petitioner rejected the

18  deal, feeling that it was still too much time.  *Id.* at 79.  Counsel represented in the

19  *Marsden* hearing that he communicated regularly with the petitioner through video-

20  conferences, phone calls and emails, and had informed him of his potential maximum

21  exposure and on the case.  *Id.* at 76.  Counsel denied that there was any irreconcilable

22  conflict between the petitioner and his office, but offered to assign a new trial attorney

23  to the case so that the petitioner could have a fresh start with someone else.  *Id.* at 80.

24  The court ultimately denied the petitioner's *Marsden* motion.  *Id.* at 83.

25         On April 6, 2011, a trial attorney from the alternate public defender's office was

26  assigned to the case. [Lodg. 1, Vol. 1, p. 52] He represented the petitioner through trial

27  and sentencing.  The petitioner raised his third and final unsuccessful *Marsden* motion

28  on the day before trial, June 27, 2011. [Doc. 1, Ex. C, pp. 86-100]

## B. Legal Standard

*Strickland*'s standards apply to claims of ineffective assistance involving counsel's advice during the plea bargaining process. *Missouri v. Frye*, ___ U.S. ___, 132 S.Ct. 1399, 1407-08 (2012); *Lafler v. Cooper*, ___ U.S. ___, 132 S. Ct. 1376, 1384 (2012). "During plea negotiations, defendants are entitled to the effective assistance of competent counsel." *Lafler*, 132 S.Ct. at 1384 (citation omitted). As a general rule, "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 132 S. Ct. at 1408. Trial counsel must also "advise a client to enter a plea bargain when it is clearly in the client's best interest." *United States v. Leonti*, 326 F.3d 1111, 1117 (9th Cir. 2003).

"A defendant has the right to make a reasonably informed decision whether to accept a plea offer." *Turner v. Calderon*, 281 F.3d 851, 880 (9th Cir. 2002) (citation omitted). Trial counsel must give the defendant sufficient information regarding a plea offer to enable him to make an intelligent decision. *Id.* at 881. "Counsel cannot be required to accurately predict what the jury or court might find," however, and "[counsel is] not constitutionally defective because he lacked a crystal ball." *Id.* The relevant question is not whether "counsel's advice [was] right or wrong, but... whether that advice was within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771 (1970).

In order to show prejudice in the context of plea offers, "a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler*, 132 S. Ct. at 1384. In cases where trial counsel's allegedly defective advice caused the defendant to reject a plea offer and proceed to trial, prejudice is demonstrated where:

> [B]ut for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court

would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Id.* at 1385.

## C. Analysis

After reviewing the complete trial record, this Court finds no grounds for relief. The petitioner is not entitled to federal habeas relief on his claim of ineffective assistance of counsel during plea negotiations because he has failed to demonstrate that his trial counsel's advice fell below an objective standard of reasonableness. It is uncontested that petitioner's counsel did in fact convey to him the prosecution's offers and advised him to accept those offers. The petitioner's chief complaints appear to be a) that he was "passed from counsel to counsel" and denied "the right to establish trust through a meaningful attorney client relationship," and b) that his attorneys did not keep him informed of important matters in his case, such as the prosecution's theory, the witnesses and evidence against him, and potential defenses. *Id.* at 38.

With respect to the petitioner's first complaint, the Sixth Amendment does not guarantee a "meaningful relationship" between an accused and his counsel. *Morris v. Slappy*, 461 U.S. 1, 14 (1983). "No court could possibly guarantee that a defendant will develop [that] kind of rapport with his attorney – privately retained or provided by the public...." *Id.* at 13. While the Court is sympathetic to the difficulties the petitioner experienced, any meaningful relationship is a two-way street, and the Court finds indicia in the trial record that the petitioner bears some responsibility for the breakdown in trust between himself and counsel. The Court's opinion is informed, for example, by comments made by the petitioner's family at his sentencing hearing,[8] an incident where the petitioner flung a small cup of water at his counsel during a

---

[8] The petitioner's sister Elizabeth argued in mitigation that her brother "doesn't know how to communicate nor express his feelings." [Lodg. 3, Vol. 10, p. 2745]

1   *Marsden* hearing,[9] and the trial judge's comments that he was initially concerned that
2   the defendant would not behave himself at trial.[10]

3   Furthermore, other than the petitioner's broad assertion that his counsel failed
4   to keep him informed, there is no evidence that any counsel failed to provide the
5   petitioner with any important information as to his case.  To the contrary, counsel
6   credibly testified at the *Marsden* hearings that they conveyed plea offers to the
7   petitioner, informed him of his maximum sentencing exposure, discussed the
8   prosecution's evidence and the strengthens and weaknesses of the case, and advised
9   him to take a plea deal. *See* [Doc. 1, pp. 60-100] The petitioner's trial counsel testified
10  that he talked to the petitioner about the prosecution's case and possible defenses prior
11  to trial. *Id.* at 96.  The trial court found counsel's *Marsden* testimony credible and
12  discredited the contrary statements of the petitioner. *E.g.* [Doc. 1, Ex. C, p. 99] ("The
13  Court: For the record, I don't believe [counsel] did that.  I believe you're lying about
14  that.").  Accordingly, the petitioner has failed to demonstrate that his counsel was
15  ineffective, and he has also failed to show prejudice, as he has not demonstrated that
16  "but for the ineffective advice of counsel there is a reasonable probability" that he
17  would have accepted a deal and received a better outcome at sentencing. *See Lafler*,
18  132 S. Ct. at 1384.

19  In conclusion, mindful of AEDPA's doubly deferential standard of review of a
20  state court's denial of IAC claims, this Court finds that the California Supreme Court
21  acted reasonably when it denied the petitioner's claim of ineffective assistance of trial
22  counsel during plea negotiations.  The Court recommends that the District Court
23  DENY the petitioner's second claim.

24  //

25
26  [9] *See* [Doc. 1, p. 98]

27  [10] At sentencing, the trial judge stated: "Mr. Estrada, I have to tell you, too, I
    thought you conducted yourself very well during the trial.  I was a little worried at the
28  beginning of the trial that you were going to be angry and aggressive...." [Lodg. 3, Vol.
    10, p. 2747]

## VII. CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Dana Sabraw under 28 U.S.C. §636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.  For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: 1) approving and adopting this Report and Recommendation; and 2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **October 2, 2015**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than two weeks after receipt of the objections or **October 16, 2015**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d at 1156.

IT IS SO ORDERED.

Date: August 3/ , 2015

KAREN S. CRAWFORD
United States Magistrate Judge